# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 10, 2009       Decided September 11, 2009

No. 08-7008

HAIDAR MUHSIN SALEH, ET AL.,
APPELLANTS

v.

TITAN CORPORATION,
APPELLEE

CACI INTERNATIONAL INC. AND CACI PREMIER
TECHNOLOGY, INC.,
INTERVENORS

———

Consolidated with 08-7009

———

Appeals from the United States District Court
for the District of Columbia
(No. 05cv01165)

———

*Susan L. Burke* argued the cause for appellants. With her on the briefs were *Katherine Gallagher*, *Shereef Hadi Akeel*, and *L. Palmer Foret*.

*Ari S. Zymelman* argued the cause for appellee. With him on the brief were *F. Whitten Peters*, *Kannon K. Shanmugam*, and *F. Greg Bowman*.

*J. William Koegel Jr.* argued the cause for intervenors CACI International Inc. and CACI Premier Technology, Inc. With him on the brief was *John F. O'Connor.*

Before: GARLAND and KAVANAUGH, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Dissenting opinion filed by *Circuit Judge* GARLAND.

SILBERMAN, *Senior Circuit Judge*: Plaintiff Iraqi nationals brought separate suits against two private military contractors that provided services to the U.S. government at the Abu Ghraib military prison during the war in Iraq. The district court granted summary judgment in behalf of one of the contractors, Titan Corp., on grounds that the plaintiffs' state tort claims were federally preempted. But the court denied summary judgment on those grounds to the other contractor, CACI International Inc. The court also dismissed claims both sets of plaintiffs made under the Alien Tort Statute (which is appealed only by the Titan plaintiffs) and reserved for further proceedings in the CACI case that contractor's immunity defense. We have jurisdiction over this interlocutory appeal under 28 USC §§ 1291 and 1292(b). We affirm the district court's judgment in behalf of Titan, but reverse as to CACI.

I

Defendants CACI and Titan contracted to provide in Iraq interrogation and interpretation services, respectively, to the U.S. military, which lacked sufficient numbers of trained personnel to undertake these critical wartime tasks. The contractors' employees were combined with military personnel for the purpose of performing the interrogations, and the military retained control over the tactical and strategic parameters of the mission. Two separate groups of plaintiffs, represented by the named plaintiffs Haidar Muhsin Saleh and Ilham Nassir Ibrahim, brought suit alleging that they or their relatives had been abused by employees of the two contractors during their detention and interrogation by the U.S. military at the Abu Ghraib prison complex. While the allegations in the two cases are similar, the Saleh plaintiffs also allege a broad conspiracy between and among CACI, Titan, various civilian officials (including the Secretary and two Undersecretaries of Defense), and a number of military personnel, whereas the Ibrahim plaintiffs allege only that CACI and Titan conspired in the abuse.

As we were told, a number of American servicemen have already been subjected to criminal court-martial proceedings in relation to the events at Abu Ghraib and have been convicted for their respective roles. While the federal government has jurisdiction to pursue criminal charges against the contractors should it deem such action appropriate, *see* 18 U.S.C. §§ 2340A, 2441, 3261, and although extensive investigations were pursued by the Department of Justice upon referral from the military investigator, no criminal charges eventuated against the contract employees. (Iraqi contract employees are also subject to criminal suit in Iraqi court.) Nor did the government pursue any contractual remedies against either contractor. The U.S. Army

Claims Service has confirmed that it will compensate detainees who establish legitimate claims for relief under the Foreign Claims Act, 10 U.S.C. § 2734. Saleh pursued such a route, succeeding in obtaining $5,000 in compensation, despite the fact that the Army's investigation indicated that Saleh was never actually interrogated or abused.

While the terms "torture" and "war crimes" are mentioned throughout plaintiffs' appellate briefs and were used sporadically at oral argument, the factual allegations in the plaintiffs' briefs are in virtually all instances limited to claims of "abuse" or "harm." To be sure, as the dissent emphasizes, certain allegations in the complaints are a good deal more dramatic. But after discovery and the summary judgment proceeding, for whatever reason, plaintiffs did not refer to those allegations in their briefs on appeal. Indeed, no accusation of "torture" or specific "war crimes" is made against Titan interpreters in the briefs before us. We are entitled, therefore to take the plaintiffs' cases as they present them to us. And although, for purpose of this appeal, we must credit plaintiffs' allegations of detainee abuse, defendants point out–and it is undisputed–that government investigations into the activities of the apparently relevant Titan employees John Israel and Adel Nakhla suggest that these individuals were not involved in detainee abuse at all. Other linguists mentioned in plaintiffs' briefs–"Iraqi Mike," Etaf Mheisen, and Hamza Elsherbiny–are not alleged to have engaged in abuse involving the plaintiffs. Steven Stefanowicz, alleged in one set of complaints to have been an employee of Titan, was in fact an employee of CACI. And only one specified instance of activity that would arguably fit the definition of torture (or possibly war crimes) is alleged

with respect to the actions of a CACI employee. *Titan* J.A. 567-570.[1]

Plaintiffs brought a panoply of claims, including under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*., government contracting laws, various international laws and agreements, and common law tort. In a thoughtful opinion, District Judge Robertson dismissed all of the Ibrahim plaintiffs' claims except those for assault and battery, wrongful death and survival, intentional infliction of emotional distress, and negligence. *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005). Following our decisions in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) (Edwards, J., concurring), and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), the district court held that because there is no consensus that *private* acts of torture violate the law of nations,

---

[1] The Torture Victim Protection Act, § 3(b)(1), 28 U.S.C. § 1350, defines "torture" as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual *for such purposes* as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." (emphasis added) *See Price v. Socialist People's Libyan Arab Jamalhiriya*, 294 F.3d 82, 91-94 (D.C. Cir. 2002). There is an allegation that one of *CACI*'s employees observed and encouraged the beating of a detainee's soles with a rubber hose, which could well constitute torture or a war crime.

such acts are not actionable under the ATS's grant of jurisdiction. *Ibrahim*, 391 F. Supp. 2d at 14-15.[2]

As for the remaining claims, the district court found that there was, as yet, insufficient factual support to sustain the application of the preemption defense, which the defendants had asserted. The judge ordered limited discovery regarding the military's supervision of the contract employees as well as the degree to which such employees were integrated into the military chain of command. *Id*. at 19. A year later, the district court dismissed the federal claims of the Saleh plaintiffs. *Saleh v. Titan Corp.*, 436 F. Supp. 2d 55 (D.D.C. 2006). The two sets of cases were consolidated for discovery purposes.

Following discovery, the contractors filed for summary judgment, again asserting that all remaining claims against them should be preempted as claims against civilian contractors providing services to the military in a combat context. In the absence of controlling authority, the district judge fashioned a test of first impression, according to which this preemption defense attaches only where contract employees are "under the direct command and *exclusive* operational control of the military chain of command." *Ibrahim v. Titan Corp.*, 556 F. Supp. 2d 1, 5 (D.D.C. 2007) (emphasis added). He concluded that Titan's employees were "fully integrated into [their] military units," *id*. at 10, essentially functioning "as soldiers in all but name," *id*. at 3. Although CACI employees were also integrated with military personnel and were within the chain of command, they were nevertheless found to be subject to a "dual chain of command" because the company retained the power to give "advice and

---

[2] The ATS reads, in its entirety, "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

feedback" to its employees and because interrogators were instructed to report abuses up both the company and military chains of command. *Id*. The CACI site manager, moreover, said that he had authority to prohibit interrogations inconsistent with the company ethics policy, which the district court deemed to be evidence of "dual oversight." *Id*. Thus, the remaining tort claims were held preempted as to Titan but not as to CACI. *Id*.

The losing party in each case appealed, and we heard their arguments jointly. We thus have before us two sets of appeals. The first consists of the Iraqi plaintiffs' appeals from the district court's decision in favor of Titan on both the preemption and ATS issues. The second features CACI's appeals from the district court's denial of its motion for summary judgment on the basis of preemption. We have jurisdiction pursuant to 28 U.S.C. § 1291 over the former. As to the latter, the district court has certified its denial of summary judgment for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The plaintiffs only half-heartedly object to the district judge's exercise of discretion under § 1292(b). Even if we were inclined to withdraw this permission to appeal–which we are not–we would still be required to rule on the appropriate test for combatant activities preemption in the plaintiffs' appeals against the judgment for Titan. We also have jurisdiction over the district judge's dismissal of the ATS claim in the Titan case, but not his corollary dismissal of the ATS claim in the CACI case; the plaintiffs did not cross-appeal that decision.

We think the district judge properly focused on the chain of command and the degree of integration that, in fact, existed between the military and both contractors' employees rather than the contract terms–and affirm his findings in that regard. We disagree, however, somewhat with the district court's legal test: "exclusive" operational control. That CACI's employees were expected to report to their civilian supervisors, as well as

the military chain of command, any abuses they observed and that the company retained the power to give advice and feedback to its employees, does not, in our view, detract meaningfully from the military's operational control, nor the degree of integration with which CACI's employees were melded into a military mission. We also agree with the district court's disposition of the ATS claim against Titan.

II

We conclude that plaintiffs' D.C. tort law claims are preempted for either of two alternative reasons: (a) the Supreme Court's decision in *Boyle*; and (b) the Court's other preemption precedents in the national security and foreign policy field.

* * *

Although both defendants assert that they meet the district court's "direct command and exclusive operational control" test for application of the preemption defense, CACI disputes the appropriateness of that test, arguing that it does not adequately protect the federal interest implicated by combatant activities. In CACI's view, the wartime interests of the federal government are as frustrated when a contractor within the chain of command exercises *some* level of operational control over combatant activities as would be true if all possible operational influence is exclusively in the hands of the military. For their part, the Iraqi plaintiffs agree with the district court's finding that CACI exerted sufficient operational control over its employees as to have been able to prevent the alleged prisoner abuse and thus that the company should be subject to suit. As to Titan, plaintiffs argue that the district court overlooked critical material facts, including allegations that Titan breached its contract and that the military lacked the authority to discipline Titan employees.

9

As noted, both defendants asserted a defense based on sovereign immunity, which the district court has reserved. Presumably, they would argue that, notwithstanding the exclusion of "contractors with the United States" from the definition of "Federal agency" in the Federal Tort Claims Act ("FTCA")–which, of course, waives sovereign immunity–when a contractor's individual employees under a service contract are integrated into a military operational mission, the contractor should be regarded as an extension of the military for immunity purposes. The Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1992), the primary case on which defendants rely for their preemption claim, reserved the question whether sovereign immunity could be extended to non-governmental employees, *id.* at 505 n.1, even in a case where the contractor provided a discrete product to the military.

We agree with the defendants (and the district judge) that plaintiffs' common law tort claims are controlled by *Boyle*. There, a lawsuit under Virginia tort law was brought in federal district court in behalf of a Marine pilot who was killed when his helicopter crashed into the water and he was unable to open the escape hatch (which opened out rather than in). The defendant that manufactured the helicopter alleged that the door was provided in accordance with Department of Defense specifications and, therefore, Virginia tort law was preempted. The Supreme Court agreed; it reasoned that first "uniquely federal interests" were implicated in the procurement of military equipment by the United States, and once that was recognized, a conflict with state law need not be as acute as would be true if the federal government was legislating in an area traditionally occupied by the states.

Nevertheless, the court acknowledged that a significant conflict must exist for state law to be preempted. In *Boyle*, the court observed that the contractor could not satisfy both the

government's procurement design and the state's prescribed duty of care. It looked to the FTCA's exemption to the waiver of sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), to find a statutory provision that articulated the "outlines" of the  significant conflict between federal interests and state law. *Boyle*, 487 U.S. at 511. Since the selection of the appropriate design of military equipment was obviously a governmental discretionary function and a lawsuit against a contractor that conformed to that design would impose the same costs on the government indirectly that the governmental immunity would avoid, the conflict is created.

The crucial point is that the court looked to the FTCA exceptions to the waiver of sovereign immunity to determine that the conflict was significant and to measure the boundaries of the conflict. Our dissenting colleague contends repeatedly that the FTCA is irrelevant because it specifically excludes government contractors. *See* Dissent Op. at 8, 15-16, 19. But, in that regard, our colleague is not just dissenting from our opinion, he is quarreling with *Boyle* where it was similarly argued that the FTCA could not be a basis for preemption of a suit against contractors. *See* Supplemental Brief of Petitioner at 10-11, 1988 WL 1026235; *see also* 487 U.S. at 526-27 (Brennan, J., dissenting). In our case, the relevant exception to the FTCA's waiver of sovereign immunity is the provision excepting "any claim arising out of the combatant activities of the military or armed forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j).[3] We note that this exception is even

---

[3] Although the combatant activities exception was the only FTCA exception briefed, it was suggested at oral argument that other provisions could conceivably conflict with the plaintiffs' claims,

broader than the discretionary function exception. In the latter situation, to find a conflict, one must discover a discrete discretionary governmental decision, which precludes suits based on that decision, but the former is more like a field preemption, *see, e.g.*, *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-67 (1943), because it casts an immunity net over any claim that *arises* out of combat activities. The arising-out-of test is a familiar one used in workmen's compensation statutes to denote *any* causal connection between the term of employment and the injury.[4]

The parties do not seriously dispute the proposition that uniquely federal interests are implicated in these cases, nor do the plaintiffs contend that the detention of enemy combatants is not included within the phrase "combat activities." Moreover, although the parties dispute the degree to which the contract employees were integrated into the military's operational activities, there is no dispute that they were in fact integrated and performing a common mission with the military under ultimate military command. They were subject to military direction, even if not subject to normal military discipline. Instead, the plaintiffs argue that there is not a significant conflict

---

potentially including 28 U.S.C. § 2680(k) (exempting from the immunity waiver "any claim arising in a foreign country"). Of course, since that issue has not been properly raised, we do not reach it.

[4] *See, e.g.*, *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504, 507 (1951); *U.S. Industries/Federal Sheet Metal, Inc. v. Director, OWCP*, 455 U.S. 608, 615 (1982). In the District of Columbia, scope of employment law is expansive enough "to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (quoting *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1982)).

in applying state or Iraqi tort law to the behavior of both contractors' employees because the U.S. government itself openly condemned the behavior of those responsible for abusing detainees at Abu Ghraib–at least the Army personnel involved.

In order to determine whether a significant conflict exists between the federal interests and D.C. tort law, it is necessary to consider the reasons for the combat activities exception. The legislative history of the combatant activities exception is "singularly barren," but it is plain enough that Congress sought to exempt combatant activities because such activities "by their very nature should be free from the hindrance of a possible damage suit." *Johnson v. U.S.*, 170 F.2d 767, 769 (9th Cir. 1948). As the Ninth Circuit has explained, the combatant activities exception was designed "to recognize that during wartime encounters[,] no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Koohi v. U.S.*, 976 F.2d 1328, 1337 (9th Cir. 1992) (holding preempted claims against a defense contractor implicated in the Navy's accidental shoot-down of an Iranian commercial airliner); *see also Ibrahim*, 391 F. Supp. 2d at 18 ("war is an inherently ugly business").

To be sure, to say that tort duties of reasonable care do not apply on the battlefield is not to say that soldiers are not under any legal restraint. Warmaking is subject to numerous proscriptions under federal law and the laws of war. Yet, it is clear that all of the traditional rationales for *tort* law–deterrence of risk-taking behavior, compensation of victims, and punishment of tortfeasors–are singularly out of place in combat situations, where risk-taking is the rule. *Koohi*, 976 F.2d at 1334-35; *see also, Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1493 (C.D. Cal. 1993). In short, the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield, both to preempt state or foreign

regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit. And the policies of the combatant activities exception are equally implicated whether the alleged tortfeasor is a soldier or a contractor engaging in combatant activities at the behest of the military and under the military's control. Indeed, these cases are really indirect challenges to the actions of the U.S. military (direct challenges obviously are precluded by sovereign immunity).

The nature of the conflict in this case is somewhat different from that in *Boyle*–a sharp example of discrete conflict in which satisfying both state and federal duties (*i.e.*, by designing a helicopter hatch that opens both inward and outward) was impossible. In the context of the combatant activities exception, the relevant question is not so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the state or foreign sovereign. Rather, it is the imposition *per se* of the state or foreign tort law that conflicts with the FTCA's policy of eliminating tort concepts from the battlefield. The very purposes of tort law are in conflict with the pursuit of warfare. Thus, the instant case presents us with a more general conflict preemption, to coin a term, "battle-field preemption": the federal government occupies the field when it comes to warfare, and its interest in combat is always "precisely contrary" to the imposition of a non-federal tort duty. *Boyle*, 487 U.S. at 500.

Be that as it may, there are specific conflicts created if tort suits are permitted. Of course, the costs of imposing tort liability on government contractors is passed through to the American taxpayer, as was recognized in *Boyle*. More important, whether the defendant is the military itself or its contractor, the prospect of military personnel being haled into lengthy and distracting court or deposition proceedings is the

same where, as here, contract employees are so inextricably embedded in the military structure. Such proceedings, no doubt, will as often as not devolve into an exercise in finger-pointing between the defendant contractor and the military, requiring extensive judicial probing of the government's wartime policies. Allowance of such suits will surely hamper military flexibility and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone combat situations.[5]

Further, given the numerous criminal and contractual enforcement options available to the government in responding to the alleged contractor misconduct–which options the government evidently has foregone–allowance of these claims will potentially interfere with the federal government's authority to punish and deter misconduct by its own contractors. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350-53 (2001). And as noted above, the Army Claims Service has confirmed that plaintiffs will not be totally bereft of all remedies for injuries sustained at Abu Ghraib, as they will still retain rights under the Foreign Claims Act. Thus, in light of these alternative remedies, it is simply not accurate to say, as the dissent does, that our decision today leaves the field without any law at all, Dissent Op. at 30-31.

Just as in *Boyle*, however, the "scope of displacement" of the preempted non-federal substantive law must be carefully tailored so as to coincide with the bounds of the federal interest being protected. In that case, the Supreme Court promulgated a three-part test to determine when preemption is required in the design defects context: "Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1)

---

[5] The dissent asserts that such conflicts can be ameliorated through a *deus ex machina* of litigation management. Dissent Op. at 25-26. We think that is an illusion.

the United States approved reasonably precise specifications; (2) the equipment conformed to these specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. This test served to ensure that a "discretionary function" of the government was truly at stake and to eliminate any perverse incentive for a manufacturer to fail to disclose knowledge of potential risks. *Id*. at 512-13. Here, the district court concluded that the federal interest in shielding the military from battlefield damage suits is sufficiently protected if claims against contract employees "under the direct command and exclusive operational control of the military chain of command such that they are functionally serving as soldiers" are preempted. *Ibrahim*, 556 F. Supp. 2d at 5.

We agree with CACI that this "exclusive operational control" test does not protect the full measure of the federal interest embodied in the combatant activities exception. Surely, unique and significant federal interests are implicated in situations where operational control falls short of exclusive. As CACI argues, that a contractor has exerted *some* limited influence over an operation does not undermine the federal interest in immunizing the operation from suit. Indeed, a parallel argument drawn from the Eleventh Circuit for a rule that would preclude suit "only if . . . the contractor did not participate, or participated only minimally, in the design of the defective equipment" was rejected by the Supreme Court in *Boyle* as "not a rule designed to protect the federal interest embodied in the 'discretionary function' exemption." Whether or not the contractors participated in the design of the helicopter door, the government official made the policy judgment, and it is that judgment that is protected by preemption. 487 U.S. at 513.

The district court's test as applied to CACI and Titan, moreover, creates a powerful (and perverse) economic incentive for contractors, who would obviously be deterred from reporting abuse to military authorities if such reporting alone is taken to be evidence of retained operational control. That would be quite anomalous since even uniformed military personnel are obliged to refuse manifestly unlawful orders, *see United States v. Calley*, 22 U.S.C.M.A. 534, 544 (1973), and, moreover, are encouraged to report such outside of the chain of command to inspector generals, *see, e.g.*, 10 U.S.C. § 1034. Again we see an analogy to *Boyle*. As noted, the Eleventh Circuit would have allowed the contractor a preemption defense only if the contractors did not participate at all in the design of the helicopter door. The Supreme Court pointed out that that test would create an analogous perverse incentive, discouraging contractors from participating in design features where their expertise would help to better the product. *Boyle*, 487 U.S. at 512-13.

We think that the following formulation better secures the federal interests concerned: During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted. We recognize that a service contractor might be supplying services in such a discrete manner–perhaps even in a battlefield context–that those services could be judged separate and apart from combat activities of the U.S. military.[6]

---

[6] Plaintiffs contend that government contractor preemption should be limited to procurement contracts (as in *Boyle* or *Koohi*) and should not extend to service contracts, as here. While some lower courts have limited preemption in this manner, *see, e.g.*, *McMahon v. Presidential airways Inc.*, 460 F. Supp. 2d. 1315, 1331 (M.D. Fla. 2006); *Fisher v. Halliburton*, 390 F. Supp. 2d 610, 615 (S.D. Tex. 2005), we agree

That would be analogous to the court's recognition in *Boyle* that a supply contractor that had a contract to provide a product without relevant specifications would not be entitled to the preemption defense if its sole discretion, rather than the government's, were challenged (although we are still puzzled at what interest D.C., or any state, would have in extending its tort law onto a foreign battlefield).

We believe, *compare* Dissent Op. at 21-22, our decision is consistent with statements made by the Department of Defense in a rulemaking proceeding after the alleged events in this case in which it stated that "[t]he public policy rationale behind *Boyle* does not apply when a *performance-based statement of work* is used in a services contract, because the Government does not, in fact, exercise specific control over the actions and decisions of the contractor . . . ." Contractor Personnel Authorized to Accompany U.S. Armed Forces, 73 Fed. Reg. 16,764, 16,768 (Mar. 31, 2008) (emphasis supplied). Because performance-based statements of work "describe the work in terms of the required results rather than either 'how' the work is to be accomplished or the number of hours to be provided," 48 C.F.R. § 37.602(b)(1), by definition, the military could not retain command authority nor operational control over contractors working on that basis and thus tort suits against such contractors would not be preempted under our holding. Indeed, there is no

---

with the Eleventh Circuit, which has held that the question of preemption *vel non* is not contingent on whether a contract is for goods or services. *Hudgens v. Bell Helicopters*, 328 F.3d 1329, 1345 (11th Cir. 2003) (holding claims that service contractor negligently maintained military helicopters preempted by the discretionary functions exception); *see also*, *Ibrahim*, 556 F. Supp. 2d at 4 n.3 (following *Hudgens*). Rather, "the question is whether subjecting a contractor to liability under state tort law would create a significant conflict with a unique federal interest." *Hudgens*, 328 F.3d at 1334.

indication from the department's statements that it considered, much less ruled out, whether tort suits against service contractors working within the military chain of command should be preempted on the basis of the FTCA's "combatant activities" exception.

It is argued that because the executive branch has not chosen to intervene in this suit or file an amicus brief on behalf of defendants, this case differs from *Boyle*. But the government did not participate in *Boyle* below the Supreme Court, which has also been the case in some other proceedings. *See e.g.*, *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 54 n.9 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363; *Davidowitz v. Hines*, 30 F.Supp. 470 (D. Pa. 1939), *aff'd* 312 U.S. 52; *see also Zschernig v. Miller*, 389 U.S. 429, 443 (1968) (finding Oregon statute preempted even though Solicitor General argued as amicus that application of the statute did not "unduly interfere[] with the United States' conduct of foreign relations" because "the basic allocation of power between the States and the Nation . . . cannot vary from day to day with the shifting winds at the State Department") (Stewart, J. concurring). To be sure, the executive branch has broadly condemned the shameful behavior at Abu Ghraib documented in the now infamous photographs of detainee abuse. This disavowal does not, however, bear upon the issue presented in this tort suit against these defendants. Indeed, the government acted swiftly to institute court-martial proceedings against offending military personnel, but no analogous disciplinary, criminal, or contract proceedings have been so instituted against the defendants. This fact alone indicates the government's perception of the contract employees' role in the Abu Ghraib scandal. In any event, Congress at least has indicated that common law tort suits "arising out of" combatant activities conflict with the very real interests of the military in time of war.

Our holding is also consistent with the Supreme Court's recent decision in *Wyeth v. Levine*, 555 U.S. __ (2009). In that case, the Court held that federal law did *not* preempt a patient's state law inadequate warning claim against a drug manufacturer, because compliance with both the state and federal duties was not impossible and because the manufacturer's interpretation of congressional intent was overly broad. The Court cited two "cornerstones" of preemption jurisprudence, both of which helpfully illuminate the distinctions between the instant case and *Wyeth*. *Id*., slip op. at 8. The first is congressional intent, which, while murky at best in the context of federal drug regulations, is much clearer in the case of the statutory text of the combatant activities exception. *Id*. And the second is the strong presumption against preemption in fields that the states have traditionally occupied but where Congress has legislated nonetheless. *Id*. Unlike tort regulation of dangerous or mislabeled products, the Constitution specifically commits the Nation's war powers to the federal government, and as a result, the states have traditionally played no role in warfare. We think that these "cornerstones" of preemption secure the foundation of our holding.

The federal government's interest in preventing military policy from being subjected to fifty-one separate sovereigns (and that is only counting the *American* sovereigns) is not only broad–it is also obvious. Plaintiffs did not, at the briefing stage, even identify *which* sovereign's substantive common law of tort should apply to their case although at oral argument counsel explained that, in its view, D.C. law applied.[7] Defendants' actions thus were at a minimum potentially subject to the laws of fifty states plus the District of Columbia, perhaps even U.S.

---

[7] Our dissenting colleague suggests that plaintiffs are ill-advised to base their tort claims on D.C. law. *See* Dissent Op. at 28-29. But again, we must take the case plaintiffs bring before us.

overseas dependencies and territories (if detainee counsel's reliance at oral argument on "all law" is to be credited). And as we have pointed out, on appeal plaintiffs rely on general claims of abuse which include assault and battery, negligence, and the intentional infliction of emotional distress. The application of those tort concepts surely differ in 51 jurisdictions. We can also imagine many other causes of action, which vary by jurisdiction, that under the dissent's standard could apply to employees of government contractors on the battlefield such as defamation, invasion of privacy, etc. Indeed, in light of the District's choice of law principles, *see Drs. Groover, Christie & Merrit, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (applying a "government interests analysis"), it is far from unlikely that the applicable substantive law would be that of Iraq.

The dissent suggests that some jurisdictions' tort laws – which, are not specified – might be selectively preempted, *see* Dissent Op. at 27, but apparently not even "intentional infliction of emotional distress." The dissent's focus on the notoriety of Abu Ghraib and its failure to specify which torts would be preempted runs the risk of fashioning an encroachment with federal interests that is like "a restricted railroad ticket, good for this day and train only." *Smith v. Allwright*, 321 U.S. 649, 669 (1944) (Roberts, J., dissenting).

* * *

Arguments for preemption of state prerogatives are particularly compelling in times of war. In that regard, even in the absence of *Boyle* the plaintiffs' claims would be preempted. The states (and certainly foreign entities) constitutionally and traditionally have no involvement in federal wartime policy-making. *See* U.S. Const. Art I, § 10; *see also, American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 n.11 (2003) ("If a State

were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government."); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 387-88 (2000) ("A failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply."); *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 447-49 (1979); *Zschernig v. Miller*, 389 U.S. 429 (1968); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference."). On the other side of the balance, the interests of any U.S. state (including the District of Columbia) are *de minimis* in this dispute–all alleged abuse occurred in Iraq against Iraqi citizens. The scope of displacement under our "ultimate military authority" test is thus appropriately broader than either *Boyle*'s discretionary functions test or the rule proposed by the district court. The breadth of displacement must be inversely proportional to state interests, just as it is directly proportional to the strength of the federal interest.

While the dissent suggests that the cases cited above are inapposite because the "preempted state laws conflicted with express congressional or executive policy," Dissent Op. at 16-17, the assertion is simply not accurate.[8] In *Garamendi*, for

---

[8] Neither are we persuaded by our dissenting colleague's suggestion that these cases are of little precedential weight because the state laws in the above cited cases were "specifically targeted at issues concerning the foreign relations of the United States." Dissent Op. at

example, the Supreme Court held that a California statute requiring insurance companies doing business in that state to disclose information concerning policies it sold in Europe between 1920 to 1945 was preempted by federal law. 539 U.S. at 401. As the source of preemption, the Court relied on an executive agreement between the United States and Germany. The agreement provided that Germany would form and provide funding for a foundation which would adjudicate Holocaust-era insurance claims. *Id.* at 406. For its part, the United States agreed that, should any plaintiff file a Holocaust-era insurance claim against a German company in U.S. court, the executive would submit a non-binding statement indicating "that U.S. policy interests favor dismissal on any valid legal ground." *Id.* The state and federal law thus posed no express conflict – it would have been entirely possible for insurance companies to disclose information under California's legislation and still benefit from the national government's intervention should suit be filed against them in U.S. courts. Nonetheless, the Supreme Court held that the California statute was preempted because the California statute "employs a different state system of economic pressure and in doing so undercuts the President's diplomatic discretion and choice he has made exercising it." *Id.* at 423-24 (quotation omitted); *see also id.* at 427 ("The basic fact is that California seeks to use an iron fist where the President has

---

16. Insofar as this lawsuit pursues contractors integrated within military forces on the battlefield, we believe it similarly interferes with the foreign relations of the United States as well as the President's war making authority. Moreover, contrary to the dissent, it is a black-letter principle of preemption law that generally applicable state laws may conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law. *See Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1008 (2008); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 443 (2005); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992) (plurality opinion). The Supreme Court's preemption cases thus reject the dissent's attempted distinction.

consistently chosen kid gloves."). While the dissent attempts to distinguish *Garamendi* by pointing out that the Supreme Court *characterized* the state statute at issue there as posing a "clear conflict" with federal policy, the same words could be used here.

Similarly, in *Crosby*, the Supreme Court held that a Massachusetts statute prohibiting the state from purchasing goods and services from companies doing business in Burma was preempted by a federal statute that *inter alia* gave the President the power to, upon certain conditions, prohibit United States persons from investing in Burma. 530 U.S. at 367-69. As in *Garamendi*, despite the fact that companies could comply with both state and federal laws, the Court explained that the state statute was preempted because it was "at odds with . . . the federal decision about the right degree of pressure to employ." *Id.* In other words, in both *Crosby* and *Garamendi*, preemption arose not because the state law conflicted with the express provisions of federal law, but because, under the circumstances, the very imposition of *any state law* created a conflict with federal foreign policy interests. Much the same could be said here. Not only are these cases not inapposite, they provide an alternative basis for our holding.[9]

---

[9] Even had plaintiffs focused and limited their allegations before us to actual torture, we note that Congress has passed comprehensive legislation dealing with the subject of war crimes, torture, and the conduct of U.S. citizens acting in connection with military activities abroad. Through acts such as the Torture Victim Protection Act, 28 U.S.C. § 1350, the Military Commissions Act, 10 U.S.C. § 948a *et seq*, the federal criminal torture statute, 18 U.S.C. § 2340-2340A, the War Crimes Act, 18 U.S.C. § 2441, the Foreign Claims Act, 10 U.S.C. § 2734, and the Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq*, Congress has created an extensive body of law with respect to allegations of torture. But Congress has declined to create a civil tort cause of action that plaintiffs could employ. In the TVPA, for example, Congress provided a cause of action whereby

We therefore reverse the district court's holding as to CACI and affirm its Titan holding on a broader rationale.

III

It will be recalled that our jurisdiction to entertain the ATS issue extends only to the plaintiffs' appeals against Titan and *not* to CACI's appeals from the district court's denial of its summary judgment motion on preemption grounds. The statute is a simple, if mysterious, one. It states, "the district court shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Supreme Court recently has wrestled with its meaning and its scope. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). Appellants argue that the district court erred in dismissing their claims against Titan under this statute based on their reading of *Sosa*. Titan argues that the district court correctly followed our precedents in *Tel-Oren*, 726 F.2d 774 (D.C. Cir. 1984) (Edwards, J., concurring), and *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), which conclude that the ATS provides a cause of action against states but not private persons and which survive the Supreme Court's analysis in *Sosa*.

---

U.S. residents could sue foreign actors for torture, but Congress exempted American government officers and private U.S. persons from the statute. Congress has also adopted criminal statutes that would apply to these defendants had they committed acts of torture, *see* 18 U.S.C. §§ 2340A, 2241, 3261, but Congress has not created a corresponding tort cause of action. Moreover, even in the years since Abu Ghraib, Congress has not enacted a civil cause of action allowing suit for torture, it only has extended the UCMJ to cover military contractors. 10 U.S.C. § 802.

The latter case involved a tort claim brought, *inter alia*, against a Mexican national, Sosa, who purportedly acted on the DEA's behalf to abduct a Mexican physician accused of torture and murder and bring him from Mexico to stand trial in the United States. Sosa was acquitted of criminal charges and then brought his suit. The Supreme Court, reversing the Ninth Circuit, held that four DEA agents also named as defendants were immune from suit because of an exception to the FTCA waiver of sovereign immunity for actions in foreign countries.[10] Then it turned to the claim against Sosa under the ATS. Sosa and the U.S. government argued that the ATS was only a jurisdictional grant; it did not create any substantive law, but the Court disagreed, concluding that when the statute was passed by the first Congress as part of the Judiciary Act of 1789, three limited causes of action were contemplated: piracy, infringement of ambassadorial rights, and violation of safe conduct.[11] And more important for our case, the Court opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus. *Sosa*, 542 U.S. at 732-33. The court noted, but declined to decide, the issue which divides us from the Second Circuit, whether a private actor, as opposed to a state, could be liable under the ATS. *Id*. at 733 n.20.

The holding in *Sosa*, however, was to reject the ATS claim that Alvarez was arbitrarily arrested and detained in Mexico in violation of international law because, at the threshold, there

---

[10] Apparently, Sosa never argued for federal preemption of the claims against him on grounds analogous to the instant case.

[11] There is some indication that the thoroughly modern act of aircraft hijacking may also be on this short list of universal concerns. *See, e.g., Kadić v. Karădzíc*, 70 F.3d 232, 240 (2d Cir. 1995)).

was no settled norm of international law bearing on that question that was analogous to the consensus that existed in 1789 with respect to the three concerns that motivated Congress.

Appellants argue that despite the footnote reserving the issue dividing the D.C. and Second Circuits, since the Court went on to analyze whether an ATS cause of action existed against Alvarez, it must have implicitly determined that a private actor could be liable. But that is not persuasive: courts often reserve an issue they don't have to decide because, even assuming *arguendo* they favor one side, that side loses on another ground.

Plaintiffs rely heavily on the Second Circuit's opinion in *Kadić v. Karădzíc*, 70 F.3d 232, 239 (2d Cir. 1995)), which held that for certain categories of action, including genocide, the scope of the law of nations is not confined solely to state action but reaches conduct "whether undertaken by those acting under the auspices of a state or only as private individuals." Despite the apparent breadth of this formulation, it must be remembered that in *Kadić*, the defendant was the self-proclaimed President of the Serbian Republic of Bosnia-Herzegovina, so the holding is not so broad. While Srpska was not yet internationally recognized as a state–thus technically rendering its militia a private entity–a quasi-state entity such as Radovan Karădzíc's militia is easily distinguishable from a private actor such as Titan.

The *Sosa* Court, while opening the door a crack to the expansion of international law norms to be applied under the ATS, expressed the imperative of judicial restraint. It was pointed out that federal courts today–as opposed to colonial times–are and must be reluctant to look to the common law, including international law, in derogation of the acknowledged role of legislatures in making policy. Bearing that caution in

mind, and in light of the holding in *Sosa*, we have little difficulty in affirming the district judge's dismissal of the ATS claim against Titan. As we have noted, appellants' claim–as it appeared in their briefs and oral argument before us–is stunningly broad. They claim that any "abuse" inflicted or supported by Titan's translator employees on plaintiff detainees is condemned by a settled consensus of international law. At oral argument, counsel claimed that included even assault and battery.[12] We think that is an untenable, even absurd, articulation of a supposed consensus of international law. (Indeed, it is doubtful that we can discern a U.S. national standard of treatment of prisoners–short of the Eighth Amendment.) In *Price v. Socialist People's Libyan Arab Jamalhiriya*, 294 F.3d 82, 93-4 (D.C. Cir. 2002), we specifically held that the Libyan police's very rough and abusive handling of American detainees was not a violation of the Torture Victim Protection Act ("TVPA"), § 3(b)(1), 28 U.S.C. § 1350. Although appellants there did not make a claim under the ATS, if their treatment did not violate *American* law, perforce they could not draw upon an international consensus.

Assuming, *arguendo*, that appellants had adequately alleged torture (or war crimes), there still remains the question whether

---

[12] "Court: So, your allegations are broader than torture.

Counsel: Yes. Your Honor, the allegations turn on the physical force whether or not those are labeled definitionally as torture or not doesn't really matter because we're talking about assault and batteries. And so, you know, if for example, you know, something like–

Court: So, assault and battery would be covered by the law of nations, as well. . . . Is that correct?

Counsel: . . . Yes. In this context it would be . . . ."

they would run afoul of *Sosa*'s comments. Although torture committed by a state is recognized as a violation of a settled international norm, that cannot be said of private actors. *See*, *e.g.*, *Sanchez-Espinoza*, 770 F.2d at 206-7; *see also*, Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment art. I, para. 1, Dec. 10, 1984, 108 Stat. 382, 1465 U.N.T.S. 85 (limiting definition of torture to acts by "a public official or other person acting in an official capacity"); TVPA, § 2(a), 28 U.S.C. § 1350 (establishing liability exclusively for individuals "under actual or apparent authority, or color of law, of any foreign nation").[13]

Alternatively, it is asserted that defendants, while private parties, acted under the color of law. Although we have not held either way on this variation, in *Tel-Oren*, Judge Edwards' concurring opinion, while not a court holding, suggests that the ATS extends that far. 726 F.2d at 793. And the Supreme Court in *Sosa* implied that it might be significant for Sosa to establish that Alvarez was acting "on behalf of a government." 542 U.S. at 735 (although which government–the U.S. or Mexico–is unclear). Of course, plaintiffs are unwilling to assert that the contractors are state actors. Not only would such an admission make deep inroads against their arguments with respect to the preemption defense, it would virtually concede that the contractors have sovereign immunity. Thus, as the district court recognized, appellants are caught between Scylla and Charybdis: they cannot artfully allege that the contractors acted under color

---

[13] Even if torture suits cannot be brought against private parties–at least not yet–it may be that "war crimes" have a broader reach. Of course, we reiterate that appellants have not brought to our attention any specific allegations of such behavior. Presumably for this reason, when the district court considered appellants' ATS argument, it analyzed only an asserted international law norm against torture, not war crimes.

of law for jurisdictional purposes while maintaining that their action was private when the issue is sovereign immunity. *Ibrahim*, 391 F. Supp. 2d at 14 (citing *Sanchez-Espinoza*, 770 F.2d at 207).

In light of the Supreme Court's recognition of Congress' superior legitimacy in creating causes of action, *see Sosa*, 542 U.S. at 725-28, we note that it is not as though Congress has been silent on the question of torture or war crimes. Congress has frequently legislated on this subject in such statutes as the TVPA, the Military Commissions Act, 10 U.S.C. § 948a *et seq.*, the federal torture statute, 18 U.S.C. 2340-2340A, the War Crimes Act, 18 U.S.C. § 2441, and the Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq.*, but Congress has never created this cause of action. Perhaps most relevant is the TVPA, in which Congress provided a cause of action whereby U.S. residents could sue foreign states for torture, but did not–and we must assume that was a deliberate decision–include as possible defendants either American government officers or private U.S. persons, whether or not acting in concert with government employees. We note that in his signing statement for the TVPA, President George H. W. Bush stated: "I am signing the bill based on my understanding that the Act does not permit suits for alleged human rights violations in the context of United States military operations abroad . . . ." Statement by President of the United States, *Statement by President George [H. W.] Bush upon Signing H.R. 2092*, 1992 U.S.C.C.A.N. 91 (Mar. 12, 1992).

The judicial restraint required by *Sosa* is particularly appropriate where, as here, a court's reliance on supposed international law would impinge on the foreign policy prerogatives of our legislative and executive branches. *See, e.g.*, *Garamendi*, 539 U.S. at 413-15; *Zschernig*, 389 U.S. at 440-41. As the *Sosa* Court explained: "Since many attempts by federal courts to craft remedies for the violation of new norms of

international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution." *Sosa*, 542 U.S. at 727-28.[14]

Finally, appellants' ATS claim runs athwart of our preemption analysis which is, after all, drawn from congressional stated policy, the FTCA. If we are correct in concluding that state tort law is preempted on the battlefield because it runs counter to federal interests, the application of international law to support a tort action on the battlefield must be equally barred. To be sure, ATS would be drawing on federal common law that, in turn, depends on international law, so the normal state preemption terms do not apply. But federal executive action is sometimes treated as "preempted" by legislation. *See, e.g.*, Chamber *of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332-39 (D.C. Cir. 1996). Similarly, an elaboration of international law in a tort suit applied to a battlefield is preempted by the same considerations that led us to reject the D.C. tort suit.

## IV

For the aforementioned reasons, the judgment of the district court as to Titan is affirmed. The judgment as to CACI is

---

[14] We note that the Justice Department, in its brief before the Ninth Circuit in the *Sosa* matter, took the position that "the [ATS] is not intended as a vehicle for U.S. courts to judge the lawfulness of U.S. government actions abroad in defense of national security[,] and any remedies for such actions are appropriately matters for resolution by the political branches, not the courts." Brief for the United States as Amicus Curiae in Support of Reversal of the Judgment against Defendant-Appellant Jose Francisco Sosa, *Alvarez-Machain v. Sosa*, No. 99-56880 (9th Cir. Mar. 20, 2000).

reversed in the accompanying order. Thus, plaintiffs' remaining claims are dismissed.

*So ordered*.

GARLAND, *Circuit Judge*, dissenting:  The plaintiffs in these cases allege that they were beaten, electrocuted, raped, subjected to attacks by dogs, and otherwise abused by private contractors working as interpreters and interrogators at Abu Ghraib prison. At the current stage of the litigation, we must accept these allegations as true.  The plaintiffs do not contend that the United States military authorized or instructed the contractors to engage in such acts.  No Executive Branch official has defended this conduct or suggested that it was employed to further any military purpose.  To the contrary, both the current and previous Administrations have repeatedly and vociferously condemned the conduct at Abu Ghraib as contrary to the values and interests of the United States.  So, too, has the Congress.

No act of Congress and no judicial precedent bars the plaintiffs from suing the private contractors -- who were neither soldiers nor civilian government employees.  Indeed, the only statute to which the defendants point expressly excludes private contractors from the immunity it preserves for the government. Neither President Obama nor President Bush nor any other Executive Branch official has suggested that subjecting the contractors to tort liability for the conduct at issue here would interfere with the nation's foreign policy or the Executive's ability to wage war.  To the contrary, the Department of Defense has repeatedly stated that employees of private contractors accompanying the Armed Forces in the field are *not* within the military's chain of command, and that such contractors *are* subject to civil liability.

Under the circumstances of these cases, there is no warrant for displacing the ordinary operation of state law and dismissing the plaintiffs' complaints solely on preemption grounds. Accordingly, I would affirm the district court's denial of summary judgment as to CACI and reverse its grant of summary judgment in favor of Titan.

I

Following the 2003 invasion of Iraq, the United States took over Abu Ghraib prison and used it as a detention facility. According to official Department of Defense (DOD) reports, "numerous incidents of sadistic, blatant, and wanton criminal abuses were inflicted on several detainees" at Abu Ghraib between October and December 2003. MAJ. GEN. ANTONIO M. TAGUBA, ARTICLE 15-6 INVESTIGATION OF THE 800TH MILITARY POLICE BRIGADE 16 (2004). Those reports noted the participation of contractor personnel in the abuses and specifically identified Titan and CACI employees as being among the perpetrators. *Id.* at 48; MAJ. GEN. GEORGE R. FAY, AR 15-6 INVESTIGATION OF THE ABU GHRAIB DETENTION FACILITY AND 205TH MILITARY INTELLIGENCE BRIGADE 72-73, 79, 81-82, 84, 86, 87, 89, 130-34 (2004) [hereinafter REPORT OF MAJ. GEN. FAY].

Responding to the release of graphic photographs of the conduct at Abu Ghraib, President George W. Bush declared that "the practices that took place in that prison are abhorrent and they don't represent America." White House, Press Release, President Bush Meets with Al Arabiya Television, 2004 WLNR 2540883 (May 5, 2004). Concerned that those "who want to dislike America will use this as an excuse to remind people about their dislike," he assured "[t]he people of the Middle East . . . that we will investigate fully, that we will find out the truth . . . and [that] justice will be served." *Id.* Secretary of Defense Donald Rumsfeld, testifying before Congress, similarly condemned the abuses as "inconsistent with the values of our nation." Donald H. Rumsfeld, *Testimony Before the Senate and House Armed Services Committees* 1 (May 7, 2004).[1] He, too,

---

[1] *Available at* http://armed-services.senate.gov/statemnt/ 2004/May/Rumsfeld.pdf.

stressed the damage "[t]o the reputation of our country," but said that "this is also an occasion to demonstrate to the world the difference between those who believe in democracy and human rights and those who believe in rule by the terrorist code. . . . Part of [our] mission -- part of what we believe in -- is making sure that when wrongdoing or scandal occur, that they are not covered up, but exposed, investigated, publicly disclosed -- and the guilty brought to justice." *Id.* at 1, 6. Congress expressed the same sentiments.[2]

The seventeen named plaintiffs in the cases now before us contend that they (or their deceased husbands) were among the detainees who were subjected to the abuses that the President and Secretary of Defense decried. According to their complaints, they are Iraqi nationals (or their widows) who were detained at Abu Ghraib and eventually released without charge. The defendants are two private American companies, CACI and Titan. Pursuant to government contracts, CACI provided interrogators and Titan provided interpreters who worked at Abu Ghraib.

The plaintiffs contend that CACI and Titan employees subjected them to the following acts, among many others:

> "[T]ortur[ing] [Plaintiff Ibrahim's husband] by repeatedly inflict[ing] blows and other injuries to his

---

[2]*See* S. Res. 356, 108th Cong. (2004) ("condemn[ing] in the strongest possible terms the despicable acts at Abu Ghraib prison"); H.R. Res. 627, 108th Cong. (2004) (declaring that the abuses at Abu Ghraib "are offensive to the principles and values of the American people and the United States military . . . and contradict the policies, orders, and laws of the United States and the United States military and undermine the ability of the United States military to achieve its mission in Iraq").

head and body[,] . . . thereby causing extreme physical and mental pain and suffering and, ultimately, his death." Second Am. Compl. ¶ 33, *Ibrahim v. Titan Corp.* [hereinafter *Ibrahim* Compl.].

"[T]ortur[ing] [Plaintiff] Aboud . . . [b]y beating him with fists and sticks; . . . urinating on him; . . . [and] threatening to attack him with dogs." *Id.* ¶ 38.

"[T]ortur[ing] [Plaintiff] Hadod . . . [b]y beating him with fists and striking his head against a wall; [and] forcing him to watch his elderly father being hung up and then beaten." *Id.* ¶ 42.

"[T]ortur[ing] [Plaintiff Al Jumali's husband] by beating him, gouging out one of his eyes, electrocuting him, breaking one of his legs, and spearing him, . . . thereby causing . . . his death." *Id.* ¶ 51.

"Roping Plaintiff Saleh and 12 other naked prisoners together by their genitals and then pushing one of the male detainees to the ground, causing the others to suffer extreme physical, mental and emotional distress; . . . . [r]epeatedly shocking Plaintiff Saleh with an electric stick and beating him with a cable; . . . [and] [t]ying his hands above his head and sodomizing him . . . ." Third Am. Compl. ¶ 116, *Saleh v. Titan Corp.* [hereinafter *Saleh* Compl.].

"Stripping [Plaintiff Al-Nidawi], tying his hands behind his back and releasing dogs to attack his private parts." *Id.* ¶ 142.

"[F]orc[ing] Plaintiff Haj Ali to stand on a box, with electrical wires attached to his wrists and [shocking] him with intense pulses of electricity . . . ." *Id.* ¶ 125.

Plaintiffs sued defendants for (inter alia) the common law torts of assault, battery, and intentional infliction of emotional distress. In their complaints, they name specific CACI and Titan employees alleged to have brutalized them. *Ibrahim* Compl. ¶¶ 37, 55; *Saleh* Compl. ¶¶ 17-19, 24-27, 49-50.

Although today's opinion states that the plaintiffs complain only of "abuse" and not "torture," Slip Op. at 4, the complaints repeatedly describe the conduct to which they were subjected as "torture." *See, e.g.*, *Ibrahim* Compl. ¶ 1 ("Specifically, the Plaintiffs allege that they or their decedents . . . were unlawfully tortured by agents or employees of the Defendants . . . ."); *Saleh* Compl. ¶ 1 ("alleg[ing] that Defendants tortured and otherwise mistreated Plaintiffs"). The district court certainly understood that to be what the plaintiffs allege. *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 12 (D.D.C. 2005) (Plaintiffs "assert that defendants and/or their agents tortured one or more of them."). And that is what the plaintiffs continue to allege in their briefs on appeal, which accuse both CACI and Titan employees of torturing them. *See, e.g.*, Plaintiffs-Appellees' Br. 17 (regarding CACI); Plaintiffs-Appellants' Reply Br. 11, 13, 16 (regarding Titan). In any event, the quotations set out in the previous paragraph describe some of the most egregious of the conduct at issue, and there is no dispute that if tort law applies, plaintiffs have stated a cause of action.

The court's opinion also appears to take issue with the merits of some of the plaintiffs' allegations, suggesting that government determinations cast doubt upon whether the plaintiffs were actually subjected to this conduct by the

defendants. That is not correct.[3] More important, it is irrelevant. To date, there has been *no* discovery or summary judgment on the merits of the plaintiffs' allegations -- the district court limited these to the issue of preemption. *See* 391 F. Supp. 2d at 18-19. Accordingly, and as the court acknowledges, at this stage of the litigation we must take the allegations of the complaints to be true. Slip Op. at 4; *see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993). In light of the DOD reports about what happened at Abu Ghraib, we can hardly regard those allegations as implausible.

---

[3]For example, the court accepts Titan's view that government investigations found that its employees were not involved in detainee abuse at Abu Ghraib. Slip Op. at 4. But Titan is wrong. *See* REPORT OF MAJ. GEN. FAY at 133 (finding that a Titan employee "[a]ctively participated in detainee abuse"); *id.* at 130-34 (referring two Titan and three CACI employees for possible prosecution); *see also id.* at 84 (finding that "[t]he use of dogs in the manner directed by" a CACI employee "was clearly abusive and unauthorized"). Moreover, there is no indication that the government investigators had before them the same evidence that these plaintiffs intend to present. The court also notes that the U.S. Army Claims Service has rejected one plaintiff's claim for compensation (that of Saleh himself), Slip Op. at 3-4, but there is no hint that the Claims Service has ever considered the merits of the sixteen other plaintiffs' cases. Finally, the court notes that, to date, the government has not criminally charged the contract employees. Slip Op. at 3, 18. But this sheds little light on the merits of the plaintiffs' claims, given the different burdens of proof applicable to civil and criminal proceedings, as well as the special jurisdictional problems potentially attendant to the latter. *See* REPORT OF MAJ. GEN. FAY at 49-50 (noting that, because CACI's contract may have been with the Interior Department rather than DOD, its employees "may not be subject to the Military Extraterritorial Jurisdiction Act").

Moreover -- and more important still -- today's decision preempts all such litigation, regardless of its merit. Indeed, the decision would preempt any lawsuit, even if the plaintiff had photographs that unambiguously showed private contractors in the act of abusing them. Given the findings of DOD and the declarations of President Bush and Secretary Rumsfeld, there may be at least some prisoners who have equivalent evidence. Nonetheless, far from simply "tak[ing] the plaintiffs' cases as they present them to us," Slip Op. At 4, my colleagues effectively dispose of any cases that any plaintiffs could possibly present.

Finally, it should also be emphasized that neither the *Ibrahim* nor the *Saleh* complaints allege that the defendants' actions were ordered or authorized by the United States government. Nor has any party proffered any evidence that the United States did order or authorize such conduct, or that it was undertaken to obtain information or to further any other military purpose.[4] To the contrary, the plaintiffs contend that the contractors "acted unlawfully and *without military authorization*." Plaintiffs-Appellees' Br. 46 (emphasis added).[5]

---

[4]*See* Plaintiffs-Appellees' Br. 45-46 ("The limited discovery permitted by the District Court to date, combined with the military investigations and testimony regarding Abu Ghraib, strongly suggests that the CACI employees actually were the ringleaders in the illegal abuse. . . . CACI failed to present any evidence whatsoever that the CACI employees were directed by the military, [or] received military authorization and approval, to abuse prisoners.").

[5]*See Ibrahim* Compl. ¶ 29 (alleging that the defendants committed the acts "[d]espite . . . clear expressions of United States policy, and despite the expectation that the Defendants would perform their contractual duties in accordance with United States and international law"); *Saleh* Compl. ¶ 108 (alleging that the United States intended the contractors to "conduct interrogations in accord

The *Saleh* (but not the *Ibrahim*) complaint does charge that the private contractors acted together with a small number of low-ranking soldiers -- soldiers who were later court-martialed for their unauthorized, illegal conduct. *Saleh* Compl. ¶ 28; Plaintiffs-Appellees' Br. 17-18, 24.[6] But there is no allegation, and no evidence, that those soldiers had any control, de jure or de facto, over the defendants. Hence, it is incorrect to say that "these cases are really indirect challenges to the actions of the U.S. military." Slip Op. at 12. Rather, they are direct challenges to the unlawful and unauthorized actions of private contractors.

## II

The court directs the dismissal of the plaintiffs' common law tort claims on the ground that they are preempted by federal law. But what federal law does the preempting?

The defendants (and the court) cite only one law: the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80. But if we follow our usual rule -- to learn the meaning of a statute by reading its text -- preemption under that Act is inappropriate. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The text of the FTCA does indeed evidence congressional concern with common law

---

with the relevant domestic and international laws" ).

[6]A separate RICO statement, filed solely by the *Saleh* plaintiffs, also alleged a broader conspiracy, but the district court dismissed the RICO count and the *Saleh* plaintiffs have abandoned the allegation. *See* Plaintiffs-Appellees' Br. 46. The *Ibrahim* plaintiffs never made such an allegation. *See id.* at 2.

tort claims, but that concern is directed solely at claims leveled "against the United States" for the wrongful acts of "any employee of the Government." *Id.* § 1346(b)(1). The Act *permits* plaintiffs to sue the United States in federal court for state-law torts committed by government employees within the scope of their employment, but contains specific exceptions that preserve the government's sovereign immunity under certain circumstances. *Id.* §§ 1346(b), 2671-80. Nothing in the language of the statute applies to suits brought against independent contractors, like the defendants in these cases. In fact, the reverse is true. Although the FTCA states that the term "[e]mployee of the government" includes "employees of any federal agency," it expressly states that "the term 'Federal agency' . . . *does not include any contractor* with the United States." *Id.* § 2671 (emphasis added).

In *Boyle v. United Technologies Corp.*, the Supreme Court invoked an implied, but direct conflict with the FTCA to conclude that the manufacturer of a Marine helicopter could not be held liable under state tort law for injury caused by a design defect. 487 U.S. 500 (1988). The defendants and my colleagues believe that "plaintiffs' common law tort claims are controlled by *Boyle*." Slip Op. at 9. I agree. In this Part, I will explain why a straightforward application of *Boyle* yields the conclusion that preemption of the plaintiffs' claims is unwarranted, and why we should hesitate to extend *Boyle* beyond the scope of the discretionary function exception and direct-conflict rationale that the Court relied upon in that case. My "quarrel" is not with *Boyle* -- as my colleagues suppose, *id.* at 10 -- but rather with the way in which they have extended *Boyle* beyond its rationale.

A

Nothing in *Boyle* itself warrants the preemption of state tort law in these cases. *Boyle* involved the co-pilot of a U.S. Marine

helicopter who was killed when the helicopter crashed into the ocean. His father brought a diversity action against the contractor that built the helicopter for the United States, alleging that the design was defective because the escape hatch opened outward instead of inward -- rendering it inoperable in a submerged craft. The first question the Supreme Court asked was whether the case involved "uniquely federal interests." *Boyle*, 487 U.S. at 504-05. With little difficulty, the Court concluded that "the liability of independent contractors performing work for the Federal Government . . . is an area of uniquely federal interest." *Id.* at 505 n.1. There is likewise no dispute regarding that question here.

But *Boyle* also declared that the fact that "the procurement of equipment by the United States is an area of uniquely federal interest does not . . . end the inquiry." *Id.* at 507. "That merely establishes a necessary, not a sufficient, condition for the displacement of state law." *Id.* "Displacement," the Court declared, "will occur only where . . . a significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation." *Id.* (internal citations and quotation marks omitted). "The conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the States have traditionally occupied. . . . *But conflict there must be*." *Id.* at 507-08 (emphasis added) (internal quotation marks omitted).

The Court began with a hypothetical illustrating an instance when preemption would not be warranted. "[I]t is easy to conceive," the Court said, of a "situation[] in which the duty sought to be imposed on the contractor" by state law "is not identical to one assumed under the contract, but is also not contrary to any assumed":

> If, for example, the United States contracts for the purchase . . . of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care.

*Id.* at 509. "No one suggests that state law would generally be pre-empted in this context," the Court said. *Id.* By contrast to the hypothetical air conditioner, however, the Court found a significant conflict of duties in the case of the helicopter:

> Here the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) *is precisely contrary to the duty imposed by the Government contract* (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications).

*Id.* (emphasis added).

The Court then invoked the FTCA's "discretionary function" exception to delimit the circumstances in which a state-imposed duty that is "precisely contrary to" a government contract should be preempted. The Court noted that one of the circumstances that the FTCA excepted from the statute's consent to suit was for:

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform *a discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* at 511 (emphasis added) (quoting 28 U.S.C. § 2680(a)). "[T]he selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision," the Court said, and "state law which holds Government contractors liable for design defects in military equipment does *in some circumstances* present a 'significant conflict' with federal policy and must be displaced." *Id.* at 511-12 (emphasis added). The Court then outlined "the scope of displacement" necessary to avoid such conflict as follows:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment . . . . The first two of these conditions assure . . . that the design feature in question was considered by a Government officer, and not merely by the contractor itself.

*Id.* at 512.

The contracts at issue in the instant cases are like the one for the hypothetical air conditioner, not the helicopter. As in the contract for the air conditioner, these contracts simply required the contractors to provide particular receivables: interrogators and interpreters. The "asserted basis of the contractor's

liability" -- the abuse of prisoners -- is plainly not "precisely contrary to the duty imposed by the Government contract."  No party's pleadings contend that the government required or authorized the contractor personnel at Abu Ghraib to do what state law forbids.  To the contrary, the plaintiffs' contention is that the contractors "acted unlawfully and *without military authorization*."  Plaintiffs-Appellees' Br. 46 (emphasis added); *see supra* note 5.

*Boyle* has never been applied to protect a contractor from liability resulting from the contractor's violation of federal law and policy.  And there is no dispute that the conduct alleged, if true, violated both.[7]  Hence, these cases are not "within the area where the policy of the 'discretionary function' would be frustrated," and they present no "significant conflict" with federal interests.  *Boyle*, 487 U.S. at 512.  Preemption is therefore not justified under *Boyle*.

B

Recognizing that they cannot prevail under either the text of the FTCA or the holding of *Boyle*, the defendants ask us to

---

[7]My colleagues appear to acknowledge that, if the contractors' employees committed the acts alleged here, their conduct would violate U.S. law.  *See* Slip Op. at 3 (citing 18 U.S.C. § 2340A (torture); *id.* § 2441 (war crimes ); *id.* § 3261 (certain criminal offenses committed by anyone "employed by or accompanying the Armed Forces outside the United States")); *see also, e.g.*, 18 U.S.C. § 113 (describing assaults within the compass of § 3261).  The Army Field Manual requires contractors to "comply with all applicable US and/or international laws."  U.S. DEP'T OF THE ARMY, FIELD MANUAL 3-100.21, CONTRACTORS ON THE BATTLEFIELD § 1-39 (2003); *see also* REPORT OF MAJ. GEN. FAY at 12-13 (stating that "civilians who accompany or work with the US Armed Forces" are "bound by Geneva Conventions").

expand the scope of judge-made preemption. Instead of basing preemption on the FTCA's discretionary function exception -- the only exception *Boyle* discussed -- the defendants ask us to extend *Boyle* to the exception for "claim[s] arising out of the combatant activities of the military or naval forces . . . during time of war." 28 U.S.C. § 2680(j). That request finds no support in either *Boyle* or other precedents.

At the heart of *Boyle*'s analysis is the doctrine of conflict preemption. *See supra* Part II.A. As my colleagues note, preemption under the discretionary function exception is in accord with that doctrine, as it requires "a sharp example of discrete conflict in which satisfying both state and federal duties (*i.e.*, by designing a helicopter hatch that opens both inward and outward) was impossible." Slip Op. at 13. By contrast, preemption under the combatant activities exception is extraordinarily broad; as employed by my colleagues, it results not in conflict preemption but in "field preemption." *Id.* at 10, 13. Given that using the FTCA to preempt suits against private contractors is atextual, the *Boyle* Court's decision to require discrete conflict was quite sensible.

Moreover, if we go down this road and extend *Boyle* to the combatant activities exception, there is no reason to stop there. The FTCA's exceptions are not limited to discretionary functions and combatant activities. As my colleagues note, they also include "any claim arising in a foreign country." Slip Op. at 10 n.3 (quoting 28 U.S.C. § 2680(k)). Hence, the "degree of integration" test that my colleagues carefully construct for combatant activities preemption, Slip Op. at 7, seems wholly beside the point: the plaintiffs' claims arose in Iraq, a foreign country, so why should that not be the end of the matter? Indeed, the FTCA has an additional exception that protects the government from suit for "assault [and] battery" -- whether it occurs abroad or in the United States. 28 U.S.C. § 2680(h). On

the court's theory, why should these exceptions not apply to private contractors as well? Once we depart from the limiting principle of *Boyle*, it is hard to tell where to draw the line.

The Supreme Court has never extended *Boyle* beyond the discrete conflicts that application of the discretionary function exception targets. Quite the opposite, in *Correctional Services Corp. v. Malesko*, the Court described the *Boyle* defense as a "special circumstance" in which the "government has directed a contractor to do the very thing that is the subject of the claim." 534 U.S. 61, 74 n.6 (2001). *Wyeth v. Levine*, the Supreme Court's most recent preemption case, further reflects the Court's unwillingness to read broad preemptive intent from congressional silence. As *Wyeth* explained, the Court starts with the presumption that state law is not to be superseded "unless that was the clear and manifest purpose of Congress." 129 S. Ct. 1187, 1194-95 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). The Court "rel[ies] on the presumption because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.'" *Id.* at 1195 n.3 (quoting *Medtronic*, 518 U.S. at 485). Thus, *Wyeth* counsels against extending *Boyle* beyond its holding, as the FTCA evidences no "clear and manifest purpose of Congress" to preempt state-law actions against contractors under the combatant activities exception. *Id.* at 1195. Although my colleagues perceive support for their own position in *Wyeth* -- a decision in which the Court found that a federal statute *did not* preempt state tort claims -- I do not see it. It may be that congressional intent "is much clearer in the case of the statutory text of the combatant activities exception" than in "federal drug regulations." Slip Op. at 19. But the only intent that is clear in the former text is the intent to preserve sovereign immunity in suits against the United States. The FTCA says nothing at all about suits against "contractors" other than that contractors are

*not* "federal agenc[ies]" for purposes of the Act. 28 U.S.C. § 2671.

No other circuit court has gone as far as our circuit goes today. *Koohi v. United States* was, like *Boyle*, a products liability case. 976 F.2d 1328 (9th Cir. 1992). There, the Ninth Circuit did apply the combatant activities exception to bar suit against the manufacturer of an air defense system deployed on a U.S. naval vessel that shot down an Iranian aircraft. As my colleagues recognize, however, the Ninth Circuit's rationale was that tort liability is inappropriate where "*force is directed as a result of authorized military action.*" Slip Op. at 12 (emphasis added) (quoting *Koohi*, 976 F.2d at 1337). Unlike the situation in *Koohi*, where sailors fired the weapon, there is no claim here that the force used against the plaintiffs was either "directed" or "authorized" by U.S. military personnel.

Nor are my colleagues assisted by the foreign policy cases they cite. Slip Op. at 20-21. Those cases involved preemption of state laws that were *specifically targeted* at issues concerning the foreign relations of the United States, a description the court does not dispute.[8] Moreover, in virtually all of them, the

---

[8]Rather than dispute this, the court notes that it is "a black-letter principle of preemption law that generally applicable state laws *may* conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law." Slip Op. at 21 n.8 (emphasis added). As long as the word "may" is emphasized, that principle is correct. But this does not call into question the fact that no precedent has employed a foreign policy analysis to preempt generally applicable state laws (not to mention the fact that there is also no "federal scheme" here). *See* Jack Goldsmith, *Federal Courts, Foreign Affairs, and Federalism*, 83 VA. L. REV. 1617, 1711 (1997) (explaining that foreign affairs preemption should be limited to, at most, state laws that purposely interfere with foreign policy, not state laws that "are facially neutral and were not designed with the purpose of influencing U.S.

preempted state laws conflicted with *express* congressional or executive policy regarding the targeted issues. Although the court does dispute this description as to two of the cited cases, the description is accurate. In *American Insurance Association v. Garamendi*, the Supreme Court found a "clear conflict" between a California statute applying only to Holocaust-era insurance "policies issued by European companies, in Europe, to European residents," and "express federal policy" contained in Executive Branch agreements with Germany, Austria, and France. 539 U.S. 396, 425-26 (2003). Similarly, in *Crosby v. National Foreign Trade Council*, the Court preempted a state statute that expressly purported to regulate foreign commerce with Burma in ways that "undermine[d] the intended purpose and 'natural effect'" of a congressional sanctions regime aimed directly at Burma. 530 U.S. 363, 373 (2000).[9]

---

foreign relations"). The three additional Supreme Court cases that the court cites, Slip Op. at 21 n.8, are simply inapposite. None involved foreign policy and all three involved statutory provisions that expressly preempted state law. *See Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1007-8 (2008); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 442-43 (2005); *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 520-23 (1992) (plurality opinion).

[9]*See also Zschernig v. Miller*, 389 U.S. 429, 432, 440 (1968) (holding that an Oregon probate statute, which barred residents' inheritances from going to heirs in countries with confiscatory property laws, was being used to "withhold[] remittances to legatees residing in Communist countries" and thereby "intru[de] . . . into the field of foreign affairs"); *Hines v. Davidowitz*, 312 U.S. 52, 67, 74 (1941) (concluding that Pennsylvania's Alien Registration Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting "a single integrated and all-embracing system" in the federal Alien Registration Act). *See generally Medellin v. Texas*, 128 S. Ct. 1346, 1371-72 (2008) (describing *Garamendi* as a mere foreign "claims-settlement case[]

The cases before us, by contrast, involve the application of facially neutral state tort law. And there is no express congressional or executive policy with which such law conflicts. *See infra* Part II.C.[10] No precedent has employed a foreign policy analysis to preempt state law under such circumstances.[11]

---

involv[ing] a narrow set of circumstances"); *Garamendi*, 539 U.S. at 417 (describing *Zschernig* as involving a state law that "in practice had invited minute inquiries concerning the actual administration of foreign law and so was providing occasions for state judges to disparage certain foreign regimes" (internal citation and quotation marks omitted)). The remaining case cited by the court, *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979), involved application of the Constitution's Foreign Commerce Clause to state taxation of foreign commerce.

[10]In a footnote to this part of their argument, my colleagues list a miscellany of federal civil and criminal statutes relating to torture. Although they describe the list as "comprehensive," Slip Op. at 23 n.9, that description is not Congress' characterization, but theirs. Nor is there any evidence that Congress affirmatively "*declined to* create a civil tort cause of action that plaintiffs could employ," *id.* (emphasis added) -- let alone that Congress intended these statutes to displace existing state or federal law. Indeed, the only evidence of the purpose of the principal civil statute the court cites, the Torture Victim Protection Act, 28 U.S.C. § 1350 note, is that it was intended to "enhance the remedy already available" for torture victims under the ATS, S. REP. NO. 102-249, at 5 (1991); *see* H.R. REP. NO. 102-367, at 4 (1991) (same). As for the federal criminal statutes, Congress has passed a myriad of such statutes covering virtually every area of modern life, and no court has ever suggested that in so doing the legislature intended to preempt existing state laws. If anything, the cited statutes -- all of which condemn torture -- confirm that there is no conflict between state law and federal policy on that issue.

[11]*Cf. Medellin*, 128 S. Ct. at 1371-72 (refusing to preempt a "neutrally applicable state law[]" despite the President's affirmative

19

C

My colleagues acknowledge that the "nature of the conflict" they perceive in these cases is "somewhat different from that in *Boyle* -- a sharp example of discrete conflict in which satisfying both state and federal duties . . . was impossible." Slip Op. at 13. "Rather," they say, here "it is the imposition per se" of state tort law "that conflicts with the FTCA's *policy* of eliminating tort concepts from the battlefield." *Id.* (emphasis added). In short, the court's decision to utilize the combatant activities exception requires it to shift from preemption based on conflict-of-duty to preemption based on conflict-of-policy. But even if this shift were justified, we would still have no basis for ruling that such a conflict of policy exists.

1. According to the court, "the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield," and that policy is "equally implicated whether the alleged tortfeasor is a soldier or a contractor" under the circumstances at issue in these cases. Slip Op. at 12. The court is plainly correct that the FTCA's policy is to eliminate *the U.S. government's* liability for battlefield torts. That, after all, is what the FTCA says. But it is not plain that the FTCA's policy is to eliminate liability when the alleged tortfeasor is a contractor rather than a soldier. That, after all, is *not* what the FTCA says. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991) (declaring that "[t]he best evidence of [congressional] purpose is the statutory text"). Nor, as the court

---

submission that United States foreign policy would be undermined); *Garamendi*, 539 U.S. at 425-26 (preempting a California insurance statute, but distinguishing it from "a generally applicable 'blue sky' law" because the California statute "effectively singles out only policies issued by European companies, in Europe, to European residents").

recognizes, is there any support for its position in the "singularly barren" legislative history of the combatant activities exception. *Slip Op.* at 11 (quoting *Johnson v. United States*, 170 F.2d 767, 769 (9th Cir. 1948)).

Congress knows full well how to make its intention to preclude private liability known. *See, e.g.*, 22 U.S.C. § 2291-4(b) (providing that interdiction of an aircraft over foreign territory pursuant to a presidentially approved program "shall not give rise to any civil action . . . against the United States or its employees *or agents*" (emphasis added)). It has not done so here. Rather, as already discussed, Congress expressly excluded contractors from the definition of federal agencies that retained sovereign immunity under the exceptions to the Act. *See* 28 U.S.C. § 2671.

Indeed, because the FTCA concerns only the immunity of the United States, the FTCA itself does not even protect soldiers or other government employees from tort suits. That protection is afforded by the Westfall Act, which provides that, "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment," the federal employee is dismissed and "the United States shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(1). "Thereafter, the suit is governed by the FTCA and is subject to all of the FTCA's exceptions" to the waiver of sovereign immunity, including the combatant activities exception. *Wuterich v. Murtha*, 562 F.3d 375, 380 (D.C. Cir. 2009); *see* 28 U.S.C. § 2679(d)(4).

But contractors are not covered by the Westfall Act either. In fact, because that Act uses the FTCA's definitions, they are again expressly excluded from its protections. 28 U.S.C. § 2671. And yet, the court preempts this state tort action without requiring (or receiving) the Attorney General certification that

would have been necessary had the defendants been government employees rather than private contractors. It thus grants private contractors *more* protection than our soldiers and other government employees receive. Such a congressional policy cannot be inferred from the language of the FTCA.

2. There is also no indication that the Executive Branch shares the court's judgment that military contractors must be exempt from tort law. To the contrary, DOD has advised contractors that accompany the Armed Forces in the field that they *are* subject to civil liability, and it has rejected a request to extend *Boyle* to all combatant activities. Moreover, it has lent no support whatsoever to the defense of the contractors here.

In a rulemaking "to implement DoD policy regarding contractor personnel authorized to accompany U.S. Armed Forces deployed outside the United States," the Department explicitly advised military contractors that "[i]nappropriate use of force could subject a contractor or its subcontractors or employees to prosecution or *civil liability* under the laws of the United States and the host nation." Contractor Personnel Authorized to Accompany U.S. Armed Forces, 73 Fed. Reg. 16,764, 16,764, 16,767 (Mar. 31, 2008) (emphasis added) [hereinafter DFARS Rule]; *see* 48 C.F.R. § 252.225-7040(b)(3) (iii) (same).[12] When contractors expressed concern about the consequences of this advisory for their defenses in tort litigation, DOD made clear that it thought "the rule adequately allocates risks." DFARS Rule, 73 Fed. Reg. at 16,768. And it specifically rejected a suggestion that it "invite courts" to expand the reach of *Boyle* by adopting "language that would

---

[12]As there is no existing federal common law of torts that could impose civil liability, DOD's warning of civil liability under the laws of the United States can only be a reference to state tort law.

immunize contractors from tort liability." *Id.* The Department stated:

> [T]he clause retains the current rule of law, holding contractors accountable for the negligent or willful actions of their employees, officers, and subcontractors. . . . The public policy rationale behind *Boyle* does not apply when a performance-based statement of work is used in a services contract, because the Government does not, in fact, exercise specific control over the actions and decisions of the contractor or its employees or subcontractors. . . . Contractors will still be able to defend themselves when injuries to third parties are caused by the actions or decisions of the Government. However, to the extent that contractors are currently seeking to avoid accountability to third parties for their own actions by raising defenses based on the sovereignty of the United States, this rule should not send a signal that would invite courts to shift the risk of loss to innocent third parties.

*Id.*[13]

Nor has the Executive Branch evinced any concern about the imposition of tort liability in the cases now before us, notwithstanding the Army's knowledge of the ongoing

---

[13]The court states that "there is no indication" in the above-quoted statement that DOD "considered, much less ruled out, whether tort suits against service contractors *working within the military chain of command* should be preempted." Slip Op. at 17 (emphasis added). But as discussed below, DOD's position is that contractors are *not* within the military chain of command. *See infra* Part III.A.

litigation.[14] My colleagues are nonetheless convinced that the failure to institute criminal proceedings against the contractors "indicates the government's perception of the contract employees' role in the Abu Ghraib scandal." Slip Op. at 18.[15] No such inference from prosecutorial silence is warranted. The government may well believe that it faces a jurisdictional barrier to prosecution, *see supra* note 3; it may lack the evidence that these plaintiffs have; it may feel that its evidence is insufficient to satisfy the higher burden of proof applicable to a criminal prosecution; or it may simply prefer to rely on the tort system. What we cannot conclude, however, is that the government doubts "the contract employees' role in the Abu Ghraib scandal." Slip Op. at 18. *See* REPORT OF MAJ. GEN. FAY at 130-34 (implicating two Titan and three CACI employees in wrongdoing at Abu Ghraib); *id.* at 84 (finding that "[t]he use of dogs in the manner directed by" a CACI employee "was clearly abusive and unauthorized"); *id.* at 133 (finding that a Titan employee "[a]ctively participated in detainee abuse").

The position DOD took in its rulemaking on contractor liability may reflect the government's general view that

---

[14]*Compare Garamendi*, 539 U.S. at 411, 413 (citing a letter from Deputy Secretary Eizenstat to California officials stating that the California statute threatened to derail U.S. negotiations with Germany, and the amicus brief of the United States in support of preemption); *Crosby*, 530 U.S. at 386 (reasoning that "repeated representations by the Executive Branch . . . demonstrate that the state Act stands in the way of Congress's diplomatic objectives"); *Boyle*, 487 U.S. at 501-02 (in which the United States appeared as amicus curiae in support of preemption); *Hines*, 312 U.S. at 56 (same).

[15]The court also states that no "disciplinary" or "contract proceedings" have been instituted. Slip Op. at 18. There is, however, nothing in the record indicating whether such proceedings have been brought.

permitting contractor liability will advance, not impede, U.S. foreign policy by demonstrating that "the United States is committed to ensuring that its contractors are subject to proper oversight and held accountable for their actions." U.S. Dep't of State, Press Release, Department of State Legal Adviser Promotes Accountability for Private Military and Security Companies (Sept. 17, 2008).[16] The government may have refrained from participating in the two cases now before us for the same reason. As President Bush stated, "the practices that took place in that prison are abhorrent and they don't represent America." White House, Press Release, President Bush Meets with Al Arabiya Television, 2004 WLNR 2540883 (May 5, 2004). Under these circumstances, the government's failure to defend the contractors may reflect the Executive Branch's view that the country's interests are better served by demonstrating that "people will be held to account according to our laws." White House, Press Release, Press Conference of the President, 2006 WLNR 10248633 (June 14, 2006). And the Executive may believe that one way to show that "people will be held to account" is to permit this country's legal system to take its ordinary course and provide a remedy for those who were wrongfully injured.

None of this is to suggest that we can know with certainty the unexpressed policy views of Congress or the Executive, or to discount the reasonableness of the policy concerns expressed by my colleagues. Quite the contrary. But the existence of plausible yet divergent assessments of the policy consequences of tort liability further counsels against judicial preemption. If Congress believes that such liability would hamper the war effort, it can amend the FTCA or the Westfall Act to protect

---

[16]*Available at* http://geneva.usmission.gov/Press2008/September/ 0917PrivateSecurity.html.

private contractors. If the Executive is of that view, it can say so.

Under the rule adopted today, however, the court has removed an important tool from the Executive's foreign policy toolbox. Even if the Executive believes that U.S. interests would be advanced by subjecting private contractors to tort liability under these circumstances, today's decision makes it impossible to accomplish that end absent congressional action. That is a particularly ironic consequence of a rule that the court adopts based upon a quite proper concern that the Judiciary not interfere with the Executive's flexibility in the area of foreign policy.

3. In addition to their argument that the imposition of tort liability on contractors constitutes a per se conflict with the policy of the political branches, my colleagues raise more specific policy conflicts they believe tort suits would engender. Slip Op. at 13-14.

The court notes, for example, that "the costs of imposing tort liability on government contractors [will be] passed through to the American taxpayer, as was recognized in *Boyle*." *Id.* at 13. The *Boyle* Court did indeed recognize the risk of a monetary pass-through, but it did not respond by preempting all tort liability for government contractors. In fact, the Court thought that was "too broad" a response to the potential pass-through problem, *Boyle*, 487 U.S. at 510, and instead barred recovery only where there was a direct conflict with a government-imposed duty, *see id.* at 512.

My colleagues also express concern that, in the absence of preemption, U.S. military personnel will be haled into court or deposition proceedings involving private contractors. Slip Op. at 13. But that concern does not require across-the-board

preemption. Where discovery would hamper the military's mission, district courts can and must delay it -- until personnel return stateside, or until the end of the war if necessary.[17] Where production of witnesses or documents would damage national security regardless of timing, the usual privileges apply.[18] To deny preemption is not to grant plaintiffs free reign.[19]

---

[17]*See Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (noting that district courts have the tools, "in cases involving third-party subpoenas to government agencies or employees," to "properly accommodate the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations" (internal quotation marks omitted)).

[18]*See Watts*, 482 F.3d at 508 (noting that Federal Rule of Civil Procedure 45 "requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden"); *Ibrahim*, 391 F. Supp. 2d at 16 (declining "to dismiss otherwise valid claims at this early stage," but suggesting that the court would dismiss if "[m]anageability problems" emerge, "especially if discovery collides with government claims to state secrecy").

[19]The court further suggests that "allowance of these claims will potentially interfere with the federal government's authority to punish and deter misconduct by its own contractors." Slip Op. at 14. The court does not say why punishment and civil liability cannot coexist, or indeed, why they do not complement each other. The prospect of material interference is hardly self-evident, as parallel government and private litigation is the norm in cases ranging from assault, to antitrust, to securities regulation. *See, e.g.*, *Wyeth*, 129 S. Ct. at 1202 (noting that state law tort suits can complement federal enforcement by the FDA). In any event, the executive branch -- which presumably knows more about what would interfere with its prerogatives than we do -- has taken the position that civil liability should be available against military contractors. *See supra* Part II.C.2.

4. The court further suggests that the broad field preemption it prescribes is required to properly balance the federal and state interests at stake in this kind of litigation.  In support of this contention, the court declares that the "federal government's interest in preventing military policy from being subjected to fifty-one separate sovereigns . . . is not only broad -- it is also obvious."  Slip Op. at 19.  The point is indeed obvious, but also inapposite.  As discussed above, there is nothing in the pleadings or record to suggest that the abuse alleged here was part of any "military policy."  Moreover, even if there were a jurisdiction whose tort law conflicted with military policy, *Boyle* itself would provide a narrower answer:  selective preemption of "only particular elements" of the state's law. *Boyle*, 487 U.S. at 508 (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 595 (1973), for the proposition that, "assuming state law should generally govern federal land acquisitions, [the] particular state law at issue may not").[20]

The court also expresses puzzlement over what interest any state could "have in extending its tort law onto a foreign battlefield."  Slip Op. at 17.  But there is no issue of "extending" a state's law here; the case involves only the application of a state's traditional, generally applicable tort law.  That such law

---

[20]My colleagues repeatedly raise the specter that the district court might apply Iraqi tort law. *See* Slip Op. at 11, 12, 19.  But the plaintiffs reject Iraqi law as a basis for their claims, and the district court did not contemplate it.  Plaintiffs-Appellees' Br. 53-54.  Nor is it a realistic possibility.  As we explained in *Sami v. United States*, "prevailing conflicts [of law] principles . . . permit application of an alternate substantive law when foreign law conflicts with a strong public policy of the forum."  617 F.2d 755, 763 (D.C. Cir. 1979) (footnote omitted).  But even if that specter were more corporeal, it would at most warrant application of the selective preemption option mentioned above and discussed in *Boyle*, 487 U.S. at 508, not the kind of field preemption adopted in today's ruling.

may apply to conduct in a foreign country is hardly unusual. Under the Foreign Sovereign Immunities Act, for example, state tort law typically provides a cause of action even for plaintiffs who sue foreign sovereigns, including for conduct that takes place abroad.[21]

This is not to deny that many states would indeed have little or no interest in this particular litigation. But it is not clear that Virginia and California,[22] the states in which CACI and Titan maintain their principal places of business, have no interest in ensuring that their corporations refrain from abusing prisoners -- even in a foreign country. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 9 cmt. f (1971) ("[A] person is most closely related to the state of his domicil[e], and this state has jurisdiction to apply its local law to determine certain of his interests even when he is outside its territory. It may, for example, . . . forbid him to do certain things abroad.").

More important, even if the court were correct that "the interests of any U.S. state . . . are *de minimis* in this dispute" because "all alleged abuse occurred in Iraq against Iraqi citizens," Slip Op. at 21, today's decision cuts a much wider swath. It would bar suit even if the victims of the contractors'

---

[21]*See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 685 & n.4 (2004); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 491 (1983); *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1125, 1129 (D.C. Cir. 2004).

[22]The *Saleh* plaintiffs originally filed their complaint in federal district court in Titan's home jurisdiction of California, from which the case was transferred at CACI's request. *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1155 (S.D. Cal. 2005). Our district court has not yet addressed the question of which state law should apply, having limited initial proceedings to the question of preemption.

assaults were fellow Virginians or Californians -- including fellow employees of the same contractors.  *See, e.g.*, *Jones v. Halliburton Co.*, 625 F. Supp. 2d 339 (S.D. Tex. May 9, 2008) (tort suit by a Texas woman alleging rape by fellow contractor employees in Iraq).  Indeed, the decision would bar suit even if the victims were soldiers whom the contractors were hired to support.  The rule the court has announced, then, is not truly one in which the "breadth of displacement" of state law is "inversely proportional to state interests."  Slip Op. at 21.  Rather, and notwithstanding its best intentions, the court has crafted a rule that overrides state interests altogether, regardless of their strength in a given case.

In any event, there are certainly ways short of broad preemption to ensure that a trial court neither asserts jurisdiction over a case that lacks a significant connection with the forum, nor applies the law of a state with no interest in the matter.  The doctrine of forum non conveniens is one such tool.[23]  So, too, are the limits that states impose on the extraterritorial reach of their own courts,[24] as well as limitations imposed by the Constitution's Due Process Clause.[25]  Indeed, if my colleagues

_____

[23]*See, e.g.*, *Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 541 (5th Cir. 1997) (dismissing extraterritorial tort claims under forum non conveniens).

[24]*See, e.g.*, *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509-10 (D.C. Cir. 2002) (noting the limits of the District of Columbia's long-arm statute).

[25]*See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (barring extraterritorial application of a state's substantive law unless the state has a "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair"); *see also Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984) (holding that, for in

are right about the state interests at stake here, it is possible that one of these doctrines could end these cases without resort to nontextual preemption.

Finally, even if the prospect of applying state laws in this kind of case would present an insurmountable conflict with federal interests, *Boyle* again counsels a different disposition from that which my colleagues adopt. As *Boyle* explained, "where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts [with] *and is replaced by federal rules*." 487 U.S. at 507 (emphasis added). Accordingly, where the Supreme Court finds field preemption appropriate, it does not normally preempt state law and simply leave the field vacant. Instead, it substitutes a federal common law regime.[26] That is what the Court did in *Clearfield Trust Co. v. United States*, the case my colleagues cite as the archetypal example of "field preemption." Slip Op. at 10, 11; *see* 318 U.S. 363, 366-67 (1943) (holding that the rights and obligations of the United States with respect to commercial paper must be governed by a uniform federal rule). It is also what my colleagues' own analysis would dictate. *See* Slip Op. at 13 (arguing that the government's "interest in combat is always

_____

personam jurisdiction to be asserted over a nonresident corporate defendant, there must be "'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice'" (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945))).

[26]*See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964) (displacing New York's "act of state" rule because "the scope of the act of state doctrine must be determined according to federal law"); *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (holding that, because collective bargaining agreements require uniform interpretation, federal law based on "the policy of our national labor laws" must substitute for state law).

'precisely contrary' to the imposition of a *non-federal* tort duty" (emphasis added)). Yet here, the court simply leaves the field.[27]

III

For the reasons just stated, the preemption question in these cases should be controlled by *Boyle*, which authorizes displacement of state law only when a federal contract imposes a directly conflicting duty on a contractor. Because there is no such conflict here -- indeed, because the duties imposed are congruent rather than incompatible -- there is no warrant for preemption.

Nonetheless, I cannot say that my colleagues' arguments in favor of extending *Boyle* to the combatant activities exception lack weight. What I can say, in agreement with them, is that even if we do extend *Boyle*, "the 'scope of displacement' of the preempted non-federal substantive law must be carefully tailored so as to coincide with the bounds of the federal interest being protected." Slip Op. at 14 (quoting *Boyle*, 487 U.S. at 512). Subpart III.A sets out what the appropriate "scope of displacement" would be were we to rely upon the combatant activities exception, and then explains why these cases fall outside that scope. Subpart III.B discusses the problems posed by the essentially untailored test my colleagues apply instead.

---

[27]The court states that preemption of state law will not leave the plaintiffs "totally bereft of all remedies . . . as they will still retain rights under the Foreign Claims Act." Slip Op. at 14. But plaintiffs have no "rights" under that Act, which merely authorizes designated officials to make (or not make) certain payments as a matter of their unreviewable discretion. 10 U.S.C. §§ 2734, 2735; *see Collins v. United States*, 67 F.3d 284, 286-89 (Fed. Cir. 1995); *Niedbala v. United States*, 37 Fed. Cl. 43, 46, 50 (1996).

A

The FTCA's combatant activities exception preserves the United States' sovereign immunity for "[a]ny claim arising out of the combatant activities of the military or naval forces . . . during time of war." 28 U.S.C. § 2680(j). According to the statutory text, that exception -- like the discretionary function exception, the other exceptions, and the FTCA as a whole -- applies only in "civil actions . . . against the United States" and only for injuries caused by an "employee of the Government." *Id.* § 1346(b)(1). In light of the FTCA's text, the *Boyle* Court crafted preemption conditions that would assure that the discretionary function in question "was considered by a Government officer, and not merely by the contractor itself." 487 U.S. at 512. If we are to extend *Boyle* to the combatant activities exception, we must demand the same assurance. Hence, for preemption to be appropriate, it must be for "claim[s] arising out of the combatant activities *of the military or naval forces*," 28 U.S.C. § 2680(j) (emphasis added), and not for those arising out of acts performed "by the contractor itself," *Boyle*, 487 U.S. at 512.

How, then, can we tell whether a contractor's conduct actually involved the combatant activities of the military? In this respect, I agree with my colleagues that, at a minimum, the contractor must be "under the military's control." Slip Op. at 12. I disagree, however, as to how to determine the existence of such control. In the military, control is achieved through the chain of command. And the official view of the U.S. Department of Defense is that private contractors accompanying the Armed Forces in the field are *not* in that chain.

The DOD's position, as set out in its regulations governing "Contractors Accompanying the Force," is that contractors are responsible for the supervision of their own employees and that

their personnel are not in the military chain of command. The regulations state:

> The commercial firm(s) providing battlefield support services will perform the necessary supervisory and management functions of their employees. Contractor employees are not under the direct supervision of military personnel in the chain of command.

U.S. DEP'T OF THE ARMY, REG. 715-9, CONTRACTORS ACCOMPANYING THE FORCE § 3-2(f) (1999). The regulations further state: "Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel." *Id.* § 3-3(b). Titan's contract with the Army is consistent with this position. *See* Titan Statement of Work § C-1.1 (*Titan* J.A. 386) ("The Contractor shall provide all . . . supervision, and other items and services . . . necessary to provide foreign language interpretation and translation services in support of United States (U.S.) Forces.").[28]

The Army Field Manual on "Contractors on the Battlefield" is, if anything, even more emphatic on these points:

> Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command. Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government

---

[28]Titan's contract further states that "[p]ersonnel performing work under this contract shall remain employees of the Contractor and will not be considered employees of the Government." *Id.* § C-1.4.1 (*Titan* J.A. 387). CACI's contract states that its employees "are considered non-combatants." CACI Statement of Work ¶ 20(j) (*CACI* J.A. 332).

employees); only contractors manage, supervise, and give directions to their employees.

U.S. DEP'T OF THE ARMY, FIELD MANUAL 3-100.21, CONTRACTORS ON THE BATTLEFIELD § 1-22 (2003). As the Field Manual further explains:

> It is important to understand that the terms and conditions of the contract establish the relationship between the military (US Government) and the contractor; this relationship does not extend through the contractor supervisor to his employees. Only the contractor can directly supervise its employees. The military chain of command exercises management control through the contract.

*Id.* § 1-25; *see also id.* § 4-45 ("Maintaining discipline of contractor employees is the responsibility of the contractor's management structure, not the military chain of command. . . . It is the contractor who must take direct responsibility and action for his employee's conduct."); JOINT CHIEFS OF STAFF, JOINT PUB. 4-0, DOCTRINE FOR LOGISTIC SUPPORT OF JOINT OPERATIONS, at V-8 (2000) (*Titan* J.A. 568) (stating that "[c]ontract employees are disciplined by the contractor" and that "[c]ommanders have no penal authority to compel contractor personnel to perform their duties").

In sum, under the existing regulatory regime, contractor personnel are not subject to the command and control of the military. The responsibility for their supervision belongs to their civilian employers. "Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command." FIELD MANUAL 3-100.21, § 1-22. And "[c]ontracted support service personnel shall not be supervised or directed by military or Department of

the Army (DA) civilian personnel." ARMY REG. 715-9, § 3-3(b). The government exercises control only "through the contract," FIELD MANUAL 3-100.21, § 1-25, which gives the government no more control than any contracting party has over its counterparty. And that -- without more -- is not enough to make the conduct of a contractor "the combatant activities *of the military or naval forces*." 28 U.S.C. § 2680(j) (emphasis added).

Of course, the fact that preemption is not warranted by application of the combatant activities exception does not mean that preemption is never warranted. If a plaintiff challenges contractor activity that has been authorized or directed by the military, preemption by application of the discretionary function exception may result -- as it did in *Boyle*. There is no evidence in the record of these cases, however, that the brutality the plaintiffs allege was authorized or directed by the United States.

B

My colleagues reach a different disposition than I do under the combatant activities exception because they employ a different test for preemption. The test they adopt is as follows: "During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." Slip Op. at 16. But what does "integrated into" mean? How "integrated" into combatant activities must the contractor be? And what does "retains command authority" mean in light of the DOD regulations discussed above? My colleagues have created a vague and amorphous test and, in so doing, have invited precisely the kind of litigation they fear.

Today's opinion further holds that "the district judge properly focused" not on "the contract terms," but "on the chain of command *and the degree of integration that, in fact, existed* between the military and both contractors' employees." Slip Op. at 7 (emphasis added). But why should that be the proper focus? Why should we ignore the military's own description of its chain of command -- as set forth in its contracts, regulations, and manuals -- and instead investigate the facts on the ground? Does this not again invite the wide-ranging judicial inquiry -- with affidavits, depositions, and conflicting testimony -- that the court rightly abjures? The irony is again evident: we must have a robust contractor defense so as not to interfere with the Executive's conduct of war; but in applying that defense, we do not take the military at its word and instead inquire into the actual operation of its chain of command.

None of these problems are apparent in today's opinion, but that is only because the court does not apply its test to the facts of these cases. Instead, it simply states that "there is no dispute that [the contract employees] were in fact integrated and performing a common mission with the military under ultimate military command." Slip Op. at 11. But there is in fact considerable dispute over whether the contract employees were truly under the military's command at Abu Ghraib. The plaintiffs made that point in this court,[29] and they submitted substantial evidence of lack of military control in the district court.

For example, the plaintiffs submitted an affidavit from the Brigadier General in charge at Abu Ghraib, who declared: "The

---

[29]*See, e.g.*, Plaintiffs-Appellants' Br. 25 ("A reasonable jury could certainly find that the [Titan] translators who conspired with CACI employees to abuse Plaintiffs were not under the United States military's command or control.").

Titan translators and other corporate employees were not integrated into the military chain of command. . . . [M]ilitary officials could not give Titan translators and other corporate employees direct orders." Decl. of Brig. Gen. Janis Karpinski ¶ 7 (*Titan* J.A. 725-26). Similarly, an affidavit from a Military Intelligence Specialist at the prison stated: "Titan translators . . . did not act like soldiers, and my unit did not treat them like soldiers. They did not fall within the military chain of command . . . . [W]e had no means of disciplining Titan translators if they did not do what we requested." Decl. of Anthony Lagouranis ¶¶ 11-12 (*Titan* J.A. 733). Affidavits from Titan employees were in accord. A Titan Translator affirmed that: "I received assignments from soldiers, and tried to maintain a good relationship with them, but they could not give me orders. I was employed by Titan -- and only Titan could fire me. I did not report to a military chain of command." Decl. of Marwan Mawiri ¶ 9 (*Titan* J.A. 519). And a Titan employee who supervised Titan translators in Iraq declared: "Only the Titan management had the power to supervise and discipline Titan translators. . . . The military could not fire or discipline a Titan employee." Decl. of Thomas Crowley ¶¶ 7-8 (*Titan* J.A. 515).

Needless to say, there was contrary evidence as well. But surely the plaintiffs' testimonial affidavits, alone or in combination with DOD's regulatory and contractual statements, are sufficient to create a genuine issue of material fact. And for that reason, the defendants are not entitled to judgment as a matter of law at the current stage of this litigation, even under my colleagues' own test. *See* FED. R. CIV. P. 56(c) (providing that summary judgment should be granted only if "there is no genuine issue as to any material fact"); *see also Boyle*, 487 U.S. at 514 (holding that "whether the facts establish the conditions for the [preemption] defense is a question for the jury"). That the court does not reach this conclusion only confirms the

breadth of the protective cloak it has cast over the activities of private contractors.[30]

## IV

No congressional statute bars the plaintiffs' state-law actions from running their ordinary course in these cases. Indeed, the only cited statute suggests the opposite. No statement of the Executive Branch declares that its interests require dismissal of these cases. Again, the only indications we have from the government are to the contrary. Nor is there any claim that "the state-imposed duty of care that is the asserted basis of the contractor[s'] liability . . . is precisely contrary to the duty imposed by the Government contract," *Boyle*, 487 U.S. at 509, or even that the contractors came within the military's view of its chain of command.

Because "[c]ourts should preempt state law only when the justification for preemption is fairly traceable to the foreign policy choices not of the federal courts, but rather of the federal political branches," Jack Goldsmith, *Statutory Foreign Affairs Preemption*, 2000 SUP. CT. REV. 175, 213, and because the political branches have not made such policy choices evident here, I respectfully dissent.

---

[30]Because I conclude that we should permit the state-law claims to go forward at this stage, and because the plaintiffs do not contend that their Alien Tort Statute claims would provide them with different relief, *see* 28 U.S.C. § 1350, I do not address the latter.